

**ROBERT A. GORDON**
**U. S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCFY COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | | |
|---|---|---|
| In re: | * | |
| | | |
| Robert's Plumbing and | * | Case Nos. 10-23221 *et al.* |
| Heating, LLC, *et al.*, | | Chapter 11 |
| | * | |
| Debtors | | Jointly Administered Under |
| | * | Case No. 10-23221 |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### MEMORANDUM OPINION IN SUPPORT OF ORDER
### DENYING APPROVAL OF DEBTORS' DISCLOSURE STATEMENTS

**I.    Preliminary Statement**

These Jointly Administered cases were filed on June 11, 2010 (Petition Date).  Before the

Court are (1) the Disclosure Statement Regarding Debtor's Second Amended Plan of

Reorganization filed on April 21, 2011 by Debtor Robert's Plumbing and Heating, LLC (RPH)

(Amended RPH Disclosure Statement) (Dkt. No. 167) and (2) the Disclosure Statement

Regarding Plan of Reorganization of D&M Realty, LLC and Monica Harenberg (Ms. Harenberg)

filed on April 27, 2011 (Harenberg Disclosure Statement) (Dkt. No. 169).  A hearing regarding

the adequacy of the Disclosure Statements was held on June 14, 2011.

Both Disclosure Statements were filed after a September 8, 2010 hearing on RPH's

Disclosure Statement Regarding Debtor's First Amended Plan of Reorganization (First RPH

Disclosure Statement) (Dkt. No. 67).  In response to the First RPH Disclosure Statement, the

Objection of CFG Community Bank (CFG) to the Proposed Disclosure Statement Regarding Debtor's First Amended Plan of Reorganization Filed by Debtor Robert's Plumbing and Heating, LLC (CFG Objection) was filed (Dkt. No. 86) on August 23, 2010.[1]  At the September 8th hearing RPH's counsel argued for the approval of the First RPH Disclosure Statement. However, it is impossible to filibuster an inadequate disclosure statement into adequacy and the First RPH Disclosure Statement was not just inadequate, it was grossly so.  No detailed rulings were made at the hearing but the Court indicated that an order denying approval of disclosure statement without prejudice would be entered to highlight the failings of the First RPH Disclosure Statement and to also permit amendment to determine whether RPH could propose a confirmable plan.

While the oversigned was drafting the opinion in support of the anticipated order, the Amended RPH Disclosure Statement and Harenberg Disclosure Statement were filed.  In part, they appear to have been filed in the wake of (a) the undated Settlement Agreement (RPH Settlement)[2] between RPH, Ms. Harenberg, Matthew Kinkelarr, Robert Whitley, Sr., D&M Realty, LLC (D&M)[3] and CFG, a secured creditor, and (b) an apparent compromise with the Bank of Granite and proposals to other lienholders included in the Harenberg Disclosure Statement.  The RPH Settlement is simple and describes the terms upon which each of the other parties to it, including non-debtors, will repay their indebtedness to CFG.

---

[1] Unsecured creditor Ferguson Enterprises, Inc. (Ferguson) filed an untimely objection to the First RPH Disclosure Statement on September 7, 2010 which mainly parroted the CFG Objection (Dkt. No. 91).

[2] A Motion to Approve the Settlement Agreement was filed on February 10, 2011 (Dkt. No. 156).

[3] D&M is the third Debtor in this jointly administered proceeding.  It appears from the information included in the Harenberg Disclosure Statement that D&M has ceased operations and is ripe for liquidation.

While the two Disclosure Statements generated only narrow, technical objections from co-settling secured lenders, Ferguson did lodge a limited, yet important, substantive objection to the Amended RHP Disclosure Statement.[4]  The Ferguson Objection asserts that the third party releases of personal liability, and injunctions to protect the same, proposed in the RPH plan violate 11 U.S.C. §524(e).[5]  As explained in the body of this Memorandum Opinion, the Court agrees with Ferguson.

However, whether a creditor objects or not the Court has an independent duty to review the adequacy of a disclosure statement if for no other reason than to make a preliminary judgment as to whether the mandatory confirmation provisions of Section 1129(a) can be met by a proposed plan.  On that basis it is plain that the Disclosure Statements must be amended to satisfy Section 1125's standard and the case law interpreting the same. *See In re Microwave Products of America, Inc.*, 100 B. R. 376, 377 (Bankr. W.D. Tenn. 1989); *In re Metrocraft Publishing Services, Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984).  In that respect, the Disclosure Statements must provide "Adequate information."  Section 1125(a)(1) provides a definition of adequate information in the context of a disclosure statement, stating:

> "Adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of

---

[4] Objection of Ferguson Enterprises, Inc. to the Disclosure Statement Regarding Debtor's Second Amended Plan of Reorganization filed by the Debtor Robert's Plumbing and Heating, LLC (Ferguson Objection) (Dkt. No. 188).

[5] Hereafter, unless otherwise noted, all statutory citations are to the Bankruptcy Code (Code), found at Title 11 of the United States Code.

> claims or interests in the case, that would enable such a
> hypothetical investor of the relevant class to make an
> informed judgment about the plan….

Fair shorthand for this standard is that a plan proponent must include in the disclosure statement all information that is reasonably necessary to permit creditors and parties-in-interest to fairly and effectively evaluate the plan. Judged against the foregoing standard, it is plain that the Disclosure Statements are deficient in several ways.

With respect to the Debtors' financial and business affairs – their history, income and expenses, the value of their assets, and, with respect to RHP, its management structure and future plans, among other things – the Disclosure Statements merely scratch the surface in an informational sense. Accordingly, a substantial amount of financial and business information must be provided to fill the resulting void. The type of information required as a means to that end will be identified in Sections II.B and C below.

However, it is also true that the Disclosure Statements describe plans that are rife with legal defects that would prevent them from being confirmed under Section 1129, or, at a minimum would make confirmation highly unlikely. Perhaps arguments can be made that either justify or legitimize the offensive provisions. But such a presentation was not included in the Disclosure Statements.[6] If the Debtors decide to retain legally suspect provisions in their plans, and make the future disclosure statement hearing an all or nothing battle with attendant consequences, then at a minimum, the amended disclosure statements must include detailed

---

[6] With respect to RHP, many of the same legal defects have carried over from the last plan to the one now pending. Following the September 8th hearing, post-hearing memoranda were filed by both the Debtor and CFG. The oversigned began to read the Debtor's Memorandum of Fact and Law in Support of Approval of Disclosure Statement (Debtor's Memorandum) (Dkt. No. 97) but put it down at page four due to its excessive vitriol and rhetoric. In any event, subsequent memoranda cannot fix a flawed disclosure statement.

explanations of (a) relevant law that supports the provision, (b) the expected impact of the provision and (c) any facts that tend to sustain its use in the context of this case. And those disclosures would be in addition to the disclosure of adequate financial and business information regarding the underlying transactions that are at the root of any suspect provisions. With that in mind the Court rules as follows.

II.    **Required Amendments**

A.    ***The RHP Plan Cannot be Confirmed as Written***

The Court will not approve a disclosure statement when it describes a fatally flawed plan, incapable of confirmation. *In re 266 Washington Assocs.,* 141 B.R. 275, 288 (Bankr. E.D. N.Y. 1992). To do so would be an exercise in futility. As RPH's plan fits that description the Amended RPH Disclosure Statement must be rejected as *prima facie* inadequate.

*(1) The Plan Violates Section 524(e) of the Code*

Pursuant to Section 1129(a)(1), a plan must comply with the applicable provisions of the Code. Section 524(e) provides, "Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any entity for, such debt." Ferguson contends that RPH's plan violates the foregoing subsection as it expressly provides for the release of liability for certain claims against non-debtor third parties, some of whom are apparently not even principals of RHP.[7]

*Menard-Sanford v. Mabey* (*In re A.H. Robins, Inc.*), 880 F.2d 694 (4th Cir. 1989), *cert. denied*, 488 U.S. 868 (1989) represents the Fourth Circuit's only published guidance on the

---

[7] The Amended RPH Disclosure Statement also indicates that in exchange for the loss of the ability to enforce personal liability, each affected claimant will receive a *pro rata* general unsecured distribution share based upon 150% of the allowed amount of their claim.

5

question of whether a Chapter 11 plan can legally discharge, enjoin or release the liability of

non-debtor third-parties.  The *Robins* Court affirmed the lower court's confirmation of the

Debtor's injunction-laden plan.  Nevertheless, two things are certain about *Robins*: (1) the case

was exceedingly complex with infinite moving parts and the lower court found, after a lengthy

fact-gathering process aided by multiple experts, that the injunctions were crucial to the

reorganization's success and (2) the claims of the objecting class could have been paid in full

through the plan treatment afforded them.[8]  As far as complexity goes, this case and *Robins* have

about as much in common as a Stealth Jet and a Piper Cub – they both fly (so far) but that is

where the similarity ends.  Likewise, the affected creditors are being offered significantly less

than one hundred percent recovery.

   The more recent and equally complex case of *In re Continental Airlines*, 203 F.3d 203

(3rd Cir. 2000), while also refraining from positing a black letter rule either way, provides a good

framework for guiding the evaluation of the release, discharge or enjoinment of third-party

liability.  In *Continental*, the Court mandated that such extraordinary relief must be supported by

findings in the lower court that determine (a) whether the releases are fair and supported by

consideration, (b) whether the success of the reorganization is dependent upon the releases and

(c) whether the releases are a 'key element' of the plan.  203 F.3d at 215.

   In relevant part, the Amended RPH Disclosure Statement states,

> [Debtor] is now prepared to show that without those releases, the
> Purchaser will not enable the Debtor to pay anything on account of

---

[8] The *Robins* Court declined to hold that Section 524(e) created a blanket prohibition against the discharge, release or enjoinment of non-debtor, third-party liability.  Nevertheless, the decision not to enforce Section 524(e) strictly seems to have had more to do with the uniqueness of *Robins* than an analysis of the statute's plain meaning.  880 F.2d at 702.

6

> its prepetition unsecured claims, and those claims will receive nothing under any scenario. One of the two principals, Robert Whitley, is the Debtor's master plumber and is considered indispensable to the success of any plumbing operation. The other principal, Matthew Kinkelaar, is expected to make substantial contributions to the capital of the Purchaser but has advised the Debtor that he is unwilling to do so if he will remain liable for liabilities relating to the Debtor's operations and debts.

(Dkt. No. 167, p. 5). What this amounts to is a flat statement that the individuals behind RPH, along with their mystery Purchaser, will not support RPH's reorganization as proposed unless they receive releases of Personal liability.[9] If an owner's refusal to fund a plan based upon her own self-interest amounted to a good reason to grant the release of third-party liability in violation of Section 524(e) then such releases would be permitted in every case. It is this Court's view, however, that the proffered justification falls well short of an acceptable showing and seems better calculated to inspire the appointment of a trustee rather than the confirmation of a plan.

The legitimacy of the post-confirmation asset transfer contemplated by RPH, and the dearth of information regarding it, will be addressed in Section II.B(3), *infra*. Suffice to say here that the detailed particulars of that proposal may bear significantly upon RPH's attempt to secure third-party releases for non-debtor individuals.[10] The record to date, however, provides no factual basis for finding that the release of third-party liability is either warranted or desirable

---

[9] For the reasons elaborated upon below, this novel position is assumed without any compelling evidence that Creditors will be genuinely better off if the releases are granted then they otherwise would be.

[10] The Amended RPH Disclosure Statement also indicates that "claims against principals of the Debtor that were intended by such principals to be debts of the Debtor", a/k/a, 'Conduit Claims' will also be treated as being 150% of their allowed amount and presumably receive general unsecured *pro rata* shares calculated at that rate. That is the only mention of 'Conduit Claims' in the Amended RPH Disclosure Statement. As explained *infra*, the proposed treatment of those creditors seems to blatantly violate Section 1123(a)(4). Moreover, if so-called 'Conduit Claims' are not in fact liabilities of the Debtor, then the proposal is, at this juncture, frankly absurd.

and presenting the proposal as a 'take it or leave it' does not enhance RPH's cause.  Furthermore, RPH offers no legal rationale to explain why the discharge of third party liability should be permitted over the plain meaning of Section 524(e).  The nullification of claims owed by non-debtors — some of which (the 'Conduit Claims') appears to be debt that RPH is not liable for — is simply to be permitted because they demand it.  As RPH has not provided either a factual or legal basis for the contemplated action, and as the proposal appears to be grounded in bad faith, the plan provisions that bar the collection of debt from non-debtor third-parties violate Sections 524(e) and 1129(a)(1) and (3) of the Code.  Therefore the plan is unconfirmable as proposed and likewise the Amended RPH Disclosure Statement cannot be approved.[11]

*(2)    The Plan Unfairly Discriminates Among Creditors of the Same Class*

 Section 1123(a)(4) of the Code states that a plan shall, "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." In essence, RPH's plan creates four separate classes of general unsecured creditors: a convenience class (to be paid fifteen percent (15%) of their claims), a *pro rata* class that includes claims of general unsecured creditors that are too large to be included in the convenience class (to be paid a total of approximately $33,000 over three (3) years) a third, arbitrary sub-class called Assumed Vendors

---

[11] The plan proposed by Ms. Harenberg also includes third-party releases of liability that are referenced in the Harenberg Disclosure Statement.  No reason is given in support of those releases.  For the reasons explained above, the proposed release of third-party liability by the Harenberg plan likewise renders it unconfirmable and the Harenberg Disclosure Statement therefore cannot be approved.

(AV) and the yet unclassified Conduit Claims.[12]  The identities of the members of the latter two classes are not included in the Amended RPH Disclosure Statement.[13]

Per the plan, the lucky members of the AV class will be selected on or before the plan's effective date – at the sole discretion of the "Purchaser" – and will be paid seventy-five per cent (75%) of their claims over three years.  Conduit Claims (whose holders may not even hold claims against RPH) are to be treated as having claims in the amount of 150% of their total amount (to share *pro rata* with other general creditors) in consideration for the loss of their ability to enforce their claims against non-Debtor third-parties.  Why are the AV and Conduit Claims classes to receive preferential treatment?

As for the AV class, the Amended RPH Disclosure Statement indicates that this treatment will aid the reorganized Debtor/Purchaser's business by allowing them to maintain good relations with certain vendors.  Such a practice might be great for the Purchaser's business but the proposed premium treatment of the AV class on its face violates Section 1123(a)(4) while also opening the door to precisely the kind of clandestine deal-making that Section 1125, in part, was designed to eliminate.  Moreover, the notion that class members will be selected post-confirmation is absurd on its face.  As for Conduit Claims, no explanation is given for their favorable treatment.

It is possible that a detailed explanation of RPH's planned post-confirmation transactions might yield a rational basis for the proffered disparate treatment.  However, that explanation has

---

[12] The Liquidation Analysis attached as Exhibit A to the RPH Amended Disclosure Statement lists three (3) different totals for general unsecured claims.  Debtor's Schedule "F" indicates total unsecured debt of approximately $535,051.06.

[13] This in and of itself is astounding.

9

not yet been provided.  As it now stands, there is no basis other than RPH's arbitrary decision-making.  Therefore the plan is unconfirmable as proposed and likewise, the Amended RPH Disclosure Statement cannot be approved.

**B.** ***The Amended RPH Disclosure Statement is Inadequate with Respect to Information Regarding the Debtor's Financial and Business Affairs.***

    *(1)    The Relationships Among the Debtors*

These three Chapter 11 cases were administratively consolidated as a result of the grant of the unopposed Debtors' Motion for Entry of an Order Directing Join Administration of Related Chapter 11 Cases (Joint Administration Motion) (Dkt. No. 3) filed on the Petition Date.  The Joint Administration Motion gave a bare outline of the relationships among the three Debtors[14] and clipped rationale for why the cases should be consolidated.  In RPH's next amended disclosure statement, the Debtor must fill the void of information regarding the relationships among the three Debtors by providing their background and history.  This should include the identity of all interest holders, the value of their interests, any compensation or benefits received, any agreements among them relative to the Debtors' financial affairs and an explanation of any joint liability.

    *(2)    RPH's Pre Petition History and Finances*

The Amended RPH Disclosure Statement does not provide any meaningful information regarding RPH's pre-bankruptcy financial circumstances.  Indeed, RPH's prepetition financial history is summed up by the following paragraph:

> During the last three years, the Debtor's expenses increased
> significantly without a corresponding increase in revenue.

---

[14] For example, one interest holder in two of the Debtors was mentioned but not identified.

> Because of the reduction in net revenues, the Debtor has struggled to make debt service and keep up with its vendors. Historically, the Debtor was able to meet its expenses, make timely debt service, and generate a modest profit for its principals from ongoing revenues, but often it did not. Sometimes the Debtor was forced to borrow money from its principals in order to meet ongoing operating expenses, but its ability to do so has now ended.

(Dkt. No. 167, p. 3). RPH must provide a meaningful summary of its pre-bankruptcy financial affairs. At a minimum, this should include financial statements sufficient to detail RPH's changing fortunes for a representative period of time. Without a reasonable sampling of pre-bankruptcy financial history, creditors will have no reliable basis for determining the impact of this reorganization case.[15]

      *(3)*     *RPH's Performance during Bankruptcy and its Future Structure and Financial Projections*

The Amended RPH Disclosure Statement does not include any meaningful information regarding RPH's performance during bankruptcy. In that regard, the Amended RPH Disclosure Statement states:

> The Debtor made numerous changes to its business operations, to bring the costs of its business operations more in line with its revenues such as streamlining the Debtor's accounting of revenues and expenses and limiting the amounts and types of advertising (which was historically one of the Debtor's greatest operating expenses). The Debtor therefore proposed an earlier plan

---

[15] The lack of reliable information is compounded by the so-called, General Notes Regarding the Schedules filed with RPH's Statement of Financial Affairs (SOFA) and Schedules of Assets and Liabilities (Schedules) on Jun 27, 2010 (RPH General Notes) (Dkt. No. 29). The RPH General Notes present a mélange of disclaimers, disavowals, caveats, cautions and outright renouncements of the accuracy of the Schedules and SOFA. The RPH General Notes seem intended to gut those all important documents of any substance at all. They therefore make the information included in the Amended RPH Disclosure Statement all the more crucial as creditors have little that they can genuinely rely upon regarding the RPH's prepetition financial affairs.

11

> that provided for a reorganization…in which the Debtor
> would make regular monthly payments to its creditors for a
> period of time after the effective date.

(Dkt. No. 167, pgs. 3-4).  The Amended RPH Disclosure Statement does not provide any

concrete examples of how the stated generalities have impacted RPH's business, good or bad.

Moreover, the Amended RPH Disclosure Statement does not provide actual financial

information, including monthly income and expenses (highlighting any notable swings with

explanatory narrative when appropriate), to concisely summarize RPH's performance during

bankruptcy.  Without that, creditors will have no rational basis for measuring the quality of the

reorganization process and whether the Debtor can live up to its post-confirmation projections.

RPH did provide *pro forma* projections for three years after the anticipated effective date.

However, without the actual pre and post-petition information identified above, the projections

are worthless.  The Amended RPH Disclosure Statement states RPH's belief that the plan is

feasible.  However, that conclusion is unsupported for the simple reason that there is no hard

evidence of RPH's historical performance.[16]

Yet, the general lack of financial information regarding RPH pales by comparison to the

more serious issues raised by its contemplated post-confirmation existence.  The Amended RPH

Disclosure Statement provides as follows:

> Second, the new Plan calls for the transfer of the Debtor's assets to
> a new entity, referred to in the Plan as the "Purchaser".  The
> Purchaser will then infuse the successor of the Debtor's
> bankruptcy estate, called the "Liquidation Trust," with periodic

---

[16] In light of the posture of this matter, updated projections will be required in any event.  However, when printed without adjustment, RPH's *pro forma* projections were much too tiny to read.  RPH must make whatever adjustments are necessary to ensure the projections, and any other printed material, will be legible to the intended recipients if approval of some iteration of a disclosure statement is ultimately given.

cash payments in order for the trustee of the Liquidation Trust to make the Plan's periodic cash payments to creditors.   Such payments are structured as a fixed payout by making periodic distributions to creditors, *pro rata*, after the Effective Date.   The Debtor's payout obligations will be met by contributions from the Purchaser, which will generate the funds from revenues of its future operations.

The Purchaser is owned and operated by the Debtor's Chief Financial Officer, Jamie Smith. It is anticipated that the Purchaser may provide the Debtor's existing principals, Matthew Kinkelaar and Robert Whitley, with the opportunity to invest in the Purchaser.  If such opportunity is offered prior to confirmation of the Plan, the Debtor will make any necessary disclosures to the Court at or before the confirmation hearing.

(Dkt. No. 167, pgs. 4-5).  Taken at face value, it appears that RPH's principals intend to use a new entity to 'buy' RPH's assets, rid themselves of such 'bad' debt they select, cherry pick certain 'good' debt to keep, scrub themselves clean of personal liability and then continue to operate the same business as if the Chapter 11 had never been filed.  If played out, this scenario would reflect a particularly repugnant version of bad faith.  And even if the proposed transaction could be justified as legitimate, the starting point must be the disclosure of significantly more information.  Such information shall include:

1.    The Purchaser's identity, including a complete identification of its creation, structure and business;

2.    The Purchaser's assets and liabilities;

3.    A statement of the Purchaser's income and expenses for the past three years;

4.    *Pro forma* projections of the Purchaser's income and expenses for the proposed life of the plan;

5.    The identities of the Purchaser's owners, officers and directors (or members and managers) with a statement of their ownership interests and the value thereof;

13

6.      An explanation of any agreements between RPH, its owners and/or managers and members, and the Purchaser and/or its owners and/or managers, officers, and directors; and any agreements between the Purchaser and creditors of RPH;

7.      Financial information regarding the subcontracting arrangement between RPH and the Purchaser including any compensation received by RPH's principals;

8.      Any compensation of any type already received or to be paid by the Purchaser or the reorganized debtor to any of their respective managers;

9.      A specific summary of all sums to be paid into the Liquidation Trust during the life of the plan; and

10.     An explanation of why the proposed sale should be approved.

Obviously, the transaction contemplated by RPH  is not an arms-length sale and, moreover, appears to have as its primary goals the snuffing out of personal liability and retention of assets by RPH's principals.  Therefore, RPH must disclose all relevant information regarding the proposed Purchaser and its relationship with RPH.

*(4)      RPH's Assets and Liabilities*.

The Amended RPH Disclosure Statement identifies RPH's assets and assigns values to them but the bases for the values are not explained.  Likewise, the Amended RPH Disclosure Statement does not identify or describe in any meaningful detail RPH's liabilities save for a representation as to the totals of each formal class set forth in the Liquidation Analysis.  As noted in footnote 15, *supra*, the problems arising from this lack of detail are exacerbated by the RPH General Notes.[17]  RPH must identify all claims within each class and provide significantly

---

[17] The Debtor's Liquidation Analysis is similarly muted by caveats.

greater detail as to their nature, basis and amount. This is especially true with respect to the AV and Conduit Claims if RPH intends to continue to try and treat them differently.

In sum, a future RPH disclosure statement should include a comprehensive summary of RPH's assets and liabilities in easily reviewable form that includes, (1) a list of assets, their values and the bases for the valuations (including reference to appraisals or other supporting documentation if any) and (2) a list of creditor claims, the amount of each claim, and the bases for the underlying liabilities.

    (5)    *Liquidation Analysis*

RPH's Liquidation Analysis is likewise insufficient. At a minimum, RPH must provide an easily reviewable complied analysis that lists its assets and liabilities and demonstrates in a step, by step narrative manner what the net result of liquidation would be (as compared to recovery under the proposed plan) with an explanation as to why. Presumably, the revised analysis will include and compare the comprehensive information that this Memorandum Opinion requires.

    (6)    *Feasibility/Implementation of Plan*

As indicated in Section II.B(3) above, without detailed information regarding the Purchaser the Amended RPH Disclosure Statement is of little value. To cure that defect, RPH must provide all relevant information regarding the creation, funding and management, including manager's compensation and benefits, of the new entity along with a detailed explanation of the financial affairs of the Purchaser. That should include an explanation of the impact of franchising and why that will enhance the plan's likelihood of success.

15

**C. The Harenberg Disclosure Statement is Inadequate with Respect to Information Regarding the Debtor's Financial and Business Affairs.**

*(1)     The Relationships Among the Debtors*

The next iteration of the Harenberg disclosure statement must include an explanation of the relationships among the three Debtors and their interest holders for the reasons explained in Section II.B(1) above.

*(2)     Ms. Harenberg's Exemptions and General Notes Regarding the Schedules*

Ms. Harenberg filed her Statement of Financial Affairs (HSOFA) and Schedules (Harenberg Schedules) on July 9, 2010 (Dkt. No. 40). Accompanying them was a document entitled General Notes Regarding the Schedules (Harenberg General Notes). As explained in footnote 15, *supra*, above regarding the RPH General Notes, the Harenberg General Notes likewise present a cavalcade of disclaimers and renouncements of the accuracy of the HSOFA and Harenberg Schedules. If accepted at face value, they render the HSOFA and Harenberg Schedules meaningless. However, the Harenberg General Notes potentially carry much more impact than do the RPH General Notes at this stage of the case. In short, they make it impossible for creditors to know with certainty whether the proposed plan is either proposed in good faith or satisfies the liquidation test of Section 1129(a).

Specifically regarding Ms. Harenberg's claimed exemptions in her Schedule "C", the Harenberg General Notes state as follows:

> Book Value of Property Interests. It would be prohibitively expensive and unduly burdensome to obtain current market valuation of the Debtor's properly interests and other significant assets. Accordingly, unless otherwise noted, the value of assets reflected on the Schedules are merely the Debtor's best guess as to their value, rather than current market value or other valuation methodologies. In

16

> Schedule C and its exhibits, the Debtor has asserted an exemption on 100% of the Debtor's right, title, and interest in each and every asset listed on that schedule, except as otherwise expressly provided. Stated values are not intended to act as a limitation of the amount or proportion of value in which the Debtor asserts an exemption. To the extent that any exemption exceeds the maximum value of exemptions by law, the Debtor asserts that the cushion created by undervaluation of some assets will permit the excess but reserves the right to amend Schedule C to apply the exemptions differently.

(Dkt. No. 40, pgs. 2-3). Schedule "C" attempts to exempt a total of *$1,046,759* in real estate and *$34,297* in personal property.[18] To call this an act of bad faith would be a gross understatement. Recognizing this, on August 20, 2010, CFG filed its Objection by CFG Community Bank to Debtor Monica D. Harenberg's Claim of Exemptions (Exemption Objection) (Dkt. No. 81). The specific grounds underlying the Exemption Objection can be summarized as follows:

a. That Ms. Harenberg's exemptions exceeded the dollar amounts allowed by law;

b. That the exemptions as claimed are impermissibly ambiguous or non-specific; and

c. That Ms. Harenberg is not entitled to exempt property titled as Tenant's-By-The Entirety as Ms. Harenberg and her non-filing spouse have joint debts.

Ms. Harenberg neither requested a hearing on the Exemption Objection nor did she file a response to the same. On May 19, 2011, the Court entered the Order Sustaining Objection by CFG Community Bank to Debtor Monica D. Harenberg's Claim of Exemptions (Exemption Order) (Dkt. No. 185). In pertinent part the Exemption Order provided,

> The Objection is well taken and no response has been filed. Moreover, the Objection in part relies upon the Debtor's use (through incorporation) of a document entitled 'General Notes Regarding the Schedules' (Dkt. No. 40) filed by the

---

[18] The Harenberg General Notes and her Schedule "C" are attached as an Appendix.

> Debtor as a general, all purpose disclaimer to her Schedules (Dkt. No. 40). This document appears to be purposefully obtuse and calculated in part to absolve the Debtor from any responsibility for the facts set forth, and affirmed under oath, in her Schedules. In light of the multiple layers of uncertainty that result from this tactic, in addition to the overall merit of the Objection, the Objection will be sustained and the claimed exemptions vacated in their entirety.

On June 2, 2011, Ms. Harenberg filed the Debtor's Motion for Reconsideration (Reconsideration Motion) (Case No. 10-23223, Dkt. No. 37) which sought to convince the Court to reverse itself and vacate the Exemption Order. The grounds set forth in the Reconsideration Motion are not well-taken. However, for purposes of this Memorandum Opinion, and the preparation of future disclosure statements, if any, the Court's reasoning boils down to the following: to vacate the Exemption Order and reinstate Ms. Harenberg's exemptions would throw the confirmation process into mind-bending uncertainty. Ms. Harenberg's claimed exemptions are unsustainable whether Schedule "C" is viewed alone or as reflected by the funhouse mirror of the Harenberg General Notes. Without certainty regarding Ms. Harenberg's exemptions, and the value of property exempted, creditors have no way of discerning or evaluating the value of property to be distributed under the plan and thereby determine whether liquidation would be the better outcome. Hence, the consequences of both Schedule "C" and the Harenberg General Notes are disruptive in the extreme. As long as they hold sway, Ms. Harenberg's proposed plan is unconfirmable and any proposed disclosure statement cannot be approved.

Ms. Harenberg is entitled by law to exemptions. The Exemption Order specifically recognized this by offering her the opportunity to amend the vacated Schedule C. Until her

18

exemptions are properly selected and defined in a manner allowed by law, and the smokey veil of the Harenberg General Notes is cleared away, her next disclosure statement cannot be evaluated in any meaningful way.

*(3)    Ms. Harenberg's Pre Petition History and Finances*

Ms. Harenberg has not provided any meaningful information regarding her pre-bankruptcy financial circumstances.  Indeed, the Debtor's prepetition financial history is summed up by (1) a reference to the ongoing recession and (2) her failed relationships with the Bank of Granite and CFG.

Ms. Harenberg must provide a meaningful summary of her pre-bankruptcy financial affairs.  At a minimum, this should include financial statements sufficient to detail Ms. Harenberg's changing fortunes for a representative period of time.  As Ms. Harenberg's income appears to flow primarily from her real estate interests, each parcel should be analyzed individually in this regard.  Without a reasonable sampling of pre-bankruptcy history that includes a history of each parcel, creditors will have no basis for determining the impact of this reorganization case.

*(4)    Ms. Harenberg's Performance during Bankruptcy and her Real Estate Business' Future Structure and Projections*

The Harenberg Disclosure Statement does not include any meaningful information regarding Ms. Harenberg's performance during bankruptcy.  The description of her postpetition activity is limited to her proposed treatment of lienholders and her intention to transfer certain real estate out of the estate and to an insider with no benefit to creditors.

To remedy this shortfall, Ms. Harenberg must provide financial information, including monthly income and expenses (highlighting any notable swings) with appropriate narrative, that

19

will concisely summarize her performance during bankruptcy.  Without that, creditors will have

no rational basis for measuring either the quality of the reorganization process or her proposed

distributions.[19]  The Harenberg Disclosure Statement presents a complete information vacuum

and a substantial amount of information must be provided to fill this hole.

As far as the post confirmation period goes, Ms. Harenberg does provide *pro forma*

projections for three years.  However, without the actual pre and post-petition information

identified above, these projections are worthless for comparison.  There is no concrete evidence

by which creditors can judge the quality of the plan.  Without that the plan in unconfirmable.

    (5)    *Ms. Harenberg's Assets and Liabilities*.

The core problems here are (1) the lack of any explanation of the bases of value estimates

and (2) the Harenberg General Notes and Ms. Harenberg's claimed exemptions. Likewise, the

Harenberg Disclosure Statement does not identify or describe in any meaningful detail the

Debtor's liabilities save for her secured debt.  Ms. Harenberg must (a) amend her exemptions, (b)

explain the bases for her asserted value and (c) identify all claims within each class and provide

significantly greater detail as to their nature, basis and amount.

In sum, the next disclosure statement should include a comprehensive summary of Ms.

Harenberg's assets and liabilities in easily reviewable form that includes, (1) a list of assets, their

values and the bases for the valuations (including any appraisals or other supporting

documentation), (2) a list of creditor claims, the amount of each claim, and the bases for the

---

[19] Ms. Harenberg's Schedule "F" indicates a total of $679,954 in general unsecured debt.  The Harenberg Disclosure Statement projects a return of no better than 2 to 5%.

underlying liabilities and (3) the impact of Debtor's properly taken lawful exemptions when filed.

(6)    *Liquidation Analysis*

Ms. Harenberg's Liquidation Analysis will have to be amended to take into account the amendments required herein.  With those amendments, Ms. Harenberg must provide an easily reviewable complied analysis that lists her assets and liabilities and demonstrates in a step by step narrative manner what the net result of liquidation would be (as compared to recovery under the proposed plan) with an explanation as to why.

(7)    *Feasibility/Implementation of Plan*

For the same reasons indicated in Section II.B(6) above, Ms. Harenberg must provide all relevant information regarding the expected performance of her new business entities including her interest in them, any other owners or managers and any benefits or compensation to be received.

**III.    Conclusion**

The information provided in the two Disclosure Statements falls well below the minimum standard and the inclusion of outlandish provisions without rational basis has only inspired strict scrutiny.  The rulings in this Memorandum Opinion are intended to reflect that conclusion and should be interpreted as such.  Therefore, the Debtors shall have ninety (90) days from the date of entry of this Memorandum Opinion amend their respective Disclosure Statements.

cc:    Adam Hiller, Esquire
       Hiller & Arban, LLC
       1550 North French Street, 2nd Fl.
       Wilmington, DE 19801

Robert's Plumbing & Heating, LLC
3121 St. Paul Street, Suite 27
Baltimore, MD 21218

Joel L. Perrell, Jr., Esquire
Juliana Bell, Esquire
Miles & Stockbridge, P.C.
10 Light Street
Baltimore, MD 21202

Jill D. Caravaggio, Esquire
Law Office of Jill D. Caravaggio
8923 Fingerboard Road, Suite C
Frederick, MD 21704

Office of the U.S. Trustee
Garmatz Federal Courthouse
101 West Lombard Street, Suite 2625
Baltimore, MD 21201

All Creditors on Matrix

**END OF ORDER**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(at Baltimore)

In re

ROBERT'S PLUMBING AND HEATING,
LLC, *et al.*,

               Debtors.

Chapter 11

Case Nos. 10-23221-RAG, *et seq.*
(jointly administered)

**SCHEDULES OF ASSETS AND LIABILITIES
AND
STATEMENT OF FINANCIAL AFFAIRS
FOR MONICA D. HARENBERG**

Adam Hiller (Fed. Bar No. 25301)
Pinckney, Harris & Weidinger, LLC
1220 North Market Street, Suite 950
Wilmington, DE 19801
(302) 504-1497 (telephone)
(302) 442-7046 (facsimile)

*Attorneys for the Debtor*

*APPENDIX*

Monica D. Harenberg, debtor in possession (the "Debtor"), hereby submits her Schedules of Assets and Liabilities, Statements of Financial Affairs, and Chapter 11 Statement Of Current Monthly Income (collectively, the "Schedules") pursuant to 11 U.S.C. § 521 and Fed. R. Bankr. P. 1007. The notes, statements, and disclaimers made herein (the "Global Notes") are fully incorporated by reference in, and comprise an integral part of, the Schedules and should be referred to and reviewed in connection with any review of the Schedules.

## GENERAL NOTES REGARDING THE SCHEDULES

1.      Description of the Case and "As Of" Information Date.  On June 11, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Petition"). Since the Petition Date, the Debtor has operated her business and managed her property as a debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  For purposes of the Schedules, which are intended to relate to facts or events occurring before the filing of the Petition, the Debtor disclosed all facts or events through and including June 11, 2010.  The Debtor also attempted to include facts and events that occurred on the Petition Date but prior to the actual filing of the Petition, but to the extent that any such facts or events were inadvertently omitted, the Debtor reserves the right to amend the Schedules to correct any such defects.  The Debtor's bankruptcy case is jointly administered with the Chapter 11 cases of two other debtors, and these Schedules are not intended to refer to those debtors.

2.      Unaudited Financial Information. While the Debtor has sought to ensure that the Schedules are accurate and complete based upon information that was available at the time of preparation, the subsequent receipt of information or any audit may result in material changes to financial data and other information contained in the Schedules. Except as otherwise certified, all of the data set forth herein is unaudited.  The Schedules do not purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), nor are they intended to correspond to any financial statements otherwise prepared and/or distributed by the Debtor. The amounts set forth in the Schedules may differ in some respects from financial statements or other financial documents prepared by, for, or on behalf of the Debtor and those differences may be material.

3.      Accuracy. While the Debtor has sought to file complete and accurate Schedules, inadvertent errors and omissions may exist. Accordingly, the Debtor reserves the right to amend the Schedules as necessary or appropriate.

4.      Book Value of Property Interests. It would be prohibitively expensive and unduly burdensome to obtain current market valuation of the Debtor's property interests and other significant assets. Accordingly, unless otherwise noted, the value of assets reflected on the Schedules are merely the Debtor's best guess as to their value, rather than current market value or other valuation methodologies.  In Schedule C and its exhibits, the Debtor has asserted an exemption on 100% of the Debtor's right, title, and interest in each and every asset listed on that schedule, except as otherwise expressly provided.  Stated values are not intended to act as a limitation of the amount or proportion of value in which the Debtor asserts an exemption.  To the extent that any exemption exceeds the maximum value of exemptions by law, the Debtor asserts

that the cushion created by undervaluation of some assets will permit the excess but reserves the right to amend Schedule C to apply the exemptions differently.

       5.   <u>Liabilities</u>. In preparing the Schedules, the Debtor sought to allocate liabilities between prepetition and postpetition periods based on ongoing information and research. As additional information becomes available and further research is conducted, the allocation of liabilities between prepetition and postpetition periods may change and the Schedules may be amended accordingly.

       6.   <u>Claim Description</u>. Any failure to designate a claim on the Schedules as "contingent," "unliquidated," or "disputed" does not constitute an admission by the Debtor that such claim is not "contingent," "unliquidated," or "disputed." The Debtor expressly reserves the right, on her own behalf or on behalf of the estate, to dispute, or to assert offsets or defenses, to any claim reflected on the Schedules as to existence, validity, amount, classification, priority, or security, or to amend the Schedules to designate any claim as "contingent," "unliquidated," or "disputed." The Debtor has attempted to reconcile each of the claims against her own records and to dispute those with which its records disagree, but in the event the Debtor subsequently determines that any claims listed on the Schedules as "undisputed" are inconsistent with its books and records, the Debtor reserves the right to amend the Schedules to reflect that such claims are disputed, or to object to such claims without amending the Schedules if she determines that amending the Schedules is unnecessary.

       7.   <u>Executory Contracts and Unexpired Leases</u>.  In the ordinary course of her business, the Debtor may have leased real property and/or various articles of personal property from third-party lessors. Such leases are described in the Schedules, but the leased property may not be reflected in the Schedules as assets of the Debtor or property or assets of third parties within the control of the Debtor.  On or before the Petition Date, any such contracts or leases listed on Schedule G may have been terminated, may have expired, or may have been modified, amended, or supplemented from time to time by various amendments, restatements, waivers, estoppel certificates, letter and other documents, instruments and agreements which may not be listed therein. Certain of the contracts or leases listed on Schedule G may contain renewal options, guarantees or payments, options to purchase, rights of first refusal, rights to lease additional space and other miscellaneous rights, which may or may not be set forth on Schedule G.  Certain executory contracts may not have been memorialized and could be subject to dispute. Executory contracts that are oral in nature, if any, have been scheduled to the best of the Debtor's knowledge. Additionally, the Debtor may be party to various other agreements concerning real property, such as easements, rights of way, purchase options, subordination, non-disturbance, supplemental agreements, amendments/letter agreements, title documents, consents, site plans, maps and other miscellaneous agreements, and such agreements, if any, may not be set forth in Schedule G.

       Moreover, certain of the agreements listed on Schedule G may be in the nature of conditional sales agreements or secured financings. Nothing in the Schedules should be construed as an admission or determination as to the legal status of any lease or contract, including but not limited to: (i) whether the Debtor intends to assume, assume and assign, or reject any unexpired lease or executory contract; (ii) whether any interest described (or identified on the face of the controlling documents) as a lease constitutes a true lease or a financing

arrangement; (iii) whether any lease was unexpired on the Petition Date; and (iv) whether any contract was executory on the Petition Date. The Debtor reserves all of her rights, claims and causes of action with respect to the contracts and leases listed on, or omitted from, the Schedules.

8.  Secured Claims. Listing of a claim on Schedule D as a secured claim does not constitute an admission by the Debtor that such claim is secured. Any descriptions of claims, security, collateral, or value provided in Schedule D are intended only as a summary. Reference to the applicable loan agreements and related documents is necessary for a complete description of the collateral and the nature, extent and priority of any liens securing each claim listed on Schedule D. The Debtor reserves the right to dispute any claim listed on Schedule D as to amount, liability, or its classification as a secured claim. Moreover, the listing of a claim on Schedule D as a secured claim does not constitute an admission by the Debtor that to the extent such claim is secured, such claim is perfected or otherwise enforceable against property of the estate as a security interest, lien, interest, mortgage, or other encumbrance.

9.  Claim Amounts. The amount of claims of individual creditors for, among other things, merchandise, goods, services, or taxes are scheduled in accordance with the amounts invoiced by the creditors as entered on the Debtor's books and records and may not reflect credits or allowances due from such creditors to the Debtor. The Debtor reserves all rights with respect to any such credits and allowances including without limitation the right to assert claims objections and/or setoffs with respect to same. The dollar amounts of claims listed may be exclusive of contingent and unliquidated amounts.

10.  Causes of Action. The Debtor has set forth all known causes of action against third parties as assets in the Schedules. Due to the timing of the filing of the Schedules and the fact that not all causes of action may have been clearly identified, the Debtor reserves all rights with respect to any causes of action that she may have, regardless of whether and how disclosed. Neither these Global Notes nor the Schedules shall be deemed a waiver or limitation of any such causes of action. Moreover, the inadvertent failure to list a particular cause of action in the Schedules is not an admission that such cause of action does not exist and the Debtor reserves the right, at any time, to amend the Schedules to include any cause of action that was omitted. **No person reviewing the Schedules should conclude or infer that a cause of action not listed in the Schedules does not exist or has been waived, released, discharged, or otherwise extinguished, and any reliance upon such a conclusion or inference is expressly unreasonable.**

11.  Satisfied Claims. The Debtor may have satisfied, and may in the future satisfy (to the extent permitted by law), certain debts that may have constituted claims as of the Petition Date. For example and not by way of limitation, the Bankruptcy Court may enter orders authorizing the Debtor to pay certain claims incurred prior to the Petition Date, some of which may be entitled to priority treatment under 11 U.S.C. § 507. To the extent that the Debtor made payments on or after the Petition Date as permitted under the applicable orders, the recipients may not be listed in the Schedules. The inclusion of any claim on the Schedules or Statements should not be construed as an admission that such claim was not satisfied on or after the Petition Date, and the inclusion or exclusion of certain claims that were satisfied on the Petition Date shall not constitute an admission that all such claims were included or excluded. Furthermore, payment by the Debtor of any prepetition claim does not constitute an admission or estoppel that such

payment was authorized by the Court or the Bankruptcy Code, and the rights of the Debtor's estate to avoid and recover such payments is expressly preserved regardless of how such claim may appear on the Schedules.

12.     Insiders. At certain points, the Schedules require the disclosure of information pertaining to insiders of the Debtor.  Because it is often unclear who might constitute insiders of the Debtor as that term is defined by 11 U.S.C. § 101(31), the Debtor has attempted to be over-inclusive in the Schedules in disclosing information about (i) entities that may ultimately be deemed insiders by the Court, and (ii) the Debtor's transactions with, and relationships to, such entities. Nothing in the Schedules should be construed as an admission that such entities are insiders of the Debtor.

13.     Co-Defendants.  Schedule H contains a list of the parties that may be co-debtors on account of claims or obligations of the Debtor.  Parties listed on this schedule may not have consented to their inclusion on this schedule and no estoppel has been thereby created, including but not limited to the individual(s) that signed and/or verified the Schedules.  When it was uncertain whether a party was a co-debtor, the Debtor erred on the side of including it and reserves the right to amend the schedules in this regard.  The Debtor did not include any party that is merely a co-defendant in litigation with the Debtor unless such party has agreed to assume the Debtor's liability arising therefrom.

14.     Specific Notes. These Global Notes are in addition to any specific notes set forth in the Schedules.

15.     Submission of Counsel.  The execution below of counsel is for submission of these Global Notes only and does not constitute a statement under oath of the validity of the matters set forth in the Schedules.


Dated: July 9, 2010                          Respectfully submitted,
        Wilmington, Delaware

                                             PINCKNEY, HARRIS & WEIDINGER, LLC

                                              /s/ Adam Hiller
                                             Adam Hiller (Fed. Bar No. 25301)
                                             1220 North Market Street, Suite 950
                                             Wilmington, Delaware 19801
                                             (302) 504-1497 telephone
                                             (302) 442-7046 facsimile

                                             *Proposed Attorneys for the Debtor*

-4-

Form B6C
(10/05)

In re _____,    Case No. _____
                    **Debtor**                                                **(If known)**

# SCHEDULE C - PROPERTY CLAIMED AS EXEMPT

Debtor claims the exemptions to which debtor is entitled under:        ☐  Check if debtor claims a homestead exemption that exceeds
(Check one box)                                                                              $125,000.
☐  11 U.S.C. § 522(b)(2)
☐  11 U.S.C. § 522(b)(3)

| DESCRIPTION OF PROPERTY | SPECIFY LAW PROVIDING EACH EXEMPTION | VALUE OF CLAIMED EXEMPTION | CURRENT VALUE OF PROPERTY WITHOUT DEDUCTING EXEMPTION |
|---|---|---|---|
|  |  |  |  |

EXHIBIT C-1

| DESCRIPTION OF PROPERTY | SPECIFY LAW PROVIDING EACH EXEMPTION | VALUE OF CLAIMED EXEMPTION | CURRENT VALUE OF PROPERTY WITHOUT DEDUCTING EXEMPTION |
|---|---|---|---|
| 2822 Saint Paul Street, Baltimore, MD 21218 | Md. Code. Ann. Corp. § 11-504(f) | $1 | $159,573 |
| 2743 Saint Paul Street, Baltimore, MD 21218 | Md. Code. Ann. Corp. § 11-504(f) | 100% of Debtors' equity, regardless of value | $1 |
| 2918-20 N. Calvert St., Baltimore, MD 21218 | Md. Code. Ann. Corp. § 11-504(f) | $1 | $118,571 |
| 2313 S. Laurel Fork Road, Laurel Springs, NC 28644 | Md. Code. Ann. Corp. § 11-504(f) | $1 | $90,785 |
| 2900 S. Laurel Fork Road, Laurel Springs, NC 28644 | Tenancy by the Entireties | 100% of Debtors' equity, regardless of value | $53,193 |
| 164 Mountain View Lodge Dr., Glendale Springs, NC 28 | Tenancy by the Entireties | 100% of Debtors' equity, regardless of value | $993,562 |
| 2823 Saint Paul St., Baltimore, MD 21218 | Md. Code. Ann. Corp. § 11-504(f) | 100% of Debtors' equity, regardless of value | $0 |
| | TOTAL | $1,046,759 | $1,415,685 |

*Except as otherwise indicated, the Debtor's exemption of an asset is intended to include 100% of the Debtor's right, title, and interest in and to such asset. Values are approximate and reflect only the Debtor's good-faith belief in the value of the asset given.

# EXHIBIT C-2

| DESCRIPTION OF PROPERTY | SPECIFY LAW PROVIDING EACH EXEMPTION | VALUE OF CLAIMED EXEMPTION | CURRENT VALUE OF PROPERTY WITHOUT DEDUCTING EXEMPTION |
|---|---|---|---|
| All cash owned by the Debtor on the Petition Date | Md. Code. Ann. Corp. § 11-504(f) | $120 | $120 |
| M&T Bank account(s) | Md. Code. Ann. Corp. § 11-504(f) | $915 | $915 |
| ING Bank account(s) | Md. Code. Ann. Corp. § 11-504(f) | $43 | $43 |
| Point Breeze Credit Union account(s) | Md. Code. Ann. Corp. § 11-504(f) | $148 | $148 |
| Security deposits with Blue Ridge Electric | Md. Code. Ann. Corp. § 11-504(f) | $3,585 | $3,585 |
| All household goods and furnishings, including audio, video, and computer equipment, including but not limited to two bedoom sets including bedframe; living and dinng room furniture; dressers, dishes, DVDs, TVs | Md. Code. Ann. Corp. § 11-504(b)(5) | $3,800 | $3,800 |
| All books; pictures and other art objects; antiques; stamp, coin, record, tape, compact disc, and other collections or collectibles, including but not limited to books, five oil paintings, six prints, stained glass, 45 record collection, 6 collector plates | Md. Code. Ann. Corp. § 11-504(b)(4), (b)(5) | $750 | $750 |
| All wearing apparel, including but not limited to clothing and shoes | Md. Code. Ann. Corp. § 11-504(b)(4) | $450 | $450 |
| Fur coat and costume jewelry | Md. Code. Ann. Corp. § 11-504(b)(4) | $800 | $800 |
| All firearms and sports, photographic, and other hobby equipment, including but not limited to 1 handgun, 1 working rifle, 1 non-working rifle, saddle and tack, fish tanks | Md. Code. Ann. Corp. § 11-504(b)(4) | $700 | $700 |
| All of the Debtor's interest in a Northwestern Life Insurance policy, lapsed | Md. Code. Ann. Corp. § 11-504(f) | $0 | $0 |

| | | | |
|---|---|---|---|
| All of the Debtor's right, title, and interest a Morgan Stanley IRA | Md. Code. Ann. Corp. § 11-504(h) | $10,969 | $10,969 |
| All of the Debtor's right, title, and interest in Star Property Management, LLC | Md. Code. Ann. Corp. § 11-504(f) | $0 | $0 |
| All of the Debtor's right, title, and interest in Village Realty, LLC | Md. Code. Ann. Corp. § 11-504(f) | $0 | $0 |
| Debtor's interest in Franklin Templeton Utilities Fund | Md. Code. Ann. Corp. § 11-504(f) | $359 | $359 |
| All of the Debtor's right, title, and interest in D & M Realty, LLC | Md. Code. Ann. Corp. § 11-504(f) | $0 | $0 |
| Account receivable from D&M Realty LLC for reimbursement of payment to PTRS in the amount of $1,664 | Md. Code. Ann. Corp. § 11-504(f) | $1 | $1 |
| Future contingent interest in Juanita T. Harenberg Trust | Md. Code. Ann. Corp. § 11-504(f) | $0 | $0 |
| D&M Realty LLC's or Matthew Kinkelaar's obligation to reimburse sums advanced in approx. amount of $30,000 | Md. Code. Ann. Corp. § 11-504(f) | $0 | $0 |
| Centric/ De Lage Landen Financial Services' assumption of obligations on a copier contract in the amount of $25,000 | Md. Code. Ann. Corp. § 11-504(f) | $1 | $1 |
| 2001 PT Cruiser | Md. Code. Ann. Corp. § 11-504(f) | $1 | $1,300 |
| 2002 Toyota Tacoma | Md. Code. Ann. Corp. § 11-504(f) | $1 | $2,850 |
| 2004 Nissan Armada | Md. Code. Ann. Corp. § 11-504(f) | $1 | $9,675 |
| 2004 Jayco Grayhawk | Md. Code. Ann. Corp. § 11-504(f) | $1 | $13,900 |
| 2004 Bee Horse Trailer | Md. Code. Ann. Corp. § 11-504(f) | $1 | $1,000 |

| | | | |
|---|---|---|---|
| All of the Debtor's machinery, fixtures, equipment, and supplies used in business, including but not limited to laptop, copier, misc furnishings and cleaning supplies used in NC Rental properties | Md. Code. Ann. Corp. § 11-504(b)(1) | $3,000 | $3,000 |
| Horse | Md. Code. Ann. Corp. § 11-504(b)(4) | $350 | $350 |
| | TOTAL | $34,297 | $54,716 |